IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ALEXIS S. & CAIDEN S.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ALEXIS S. AND CAIDEN S., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,

V.

AMBER S., APPELLANT, AND MICHAEL B., APPELLEE AND CROSS-APPELLANT.

Filed February 6, 2018.    No. A-17-634.

Appeal from the Separate Juvenile Court of Lancaster County: ROGER J. HEIDEMAN, Judge. Affirmed.

Laurel D. Johnson, of Legal Aid of Nebraska, for appellant.

Joe Kelly, Lancaster County Attorney, Tara Parpart, and Margaret Jackson, Senior Certified Law Student, for appellee State of Nebraska.

Megan M. Schutt, of Anderson, Creager & Wittstruck, P.C., for appellee Michael B.

PIRTLE, BISHOP, and ARTERBURN, Judges.

PIRTLE, Judge.

## I. INTRODUCTION

Amber S. appeals from the order of the separate juvenile court of Lancaster County which terminated her parental rights to two of her children, Alexis S. and Caiden S. Michael B. cross-appeals from the order of the separate juvenile court of Lancaster County which terminated his parental rights to Caiden. Both Amber and Michael challenge the juvenile court's finding that there was sufficient evidence presented to prove that the children came within the meaning of one

- 1 -

of the enumerated subsections of Neb. Rev. Stat. § 43-292 (Reissue 2016) and that termination of their parental rights is in the children's best interests. Upon our de novo review of the record, and for the reasons that follow, we affirm the termination of Amber's and Michael's parental rights.

## II. BACKGROUND

### 1. PARTIES

These juvenile proceedings involve Alexis, born in October 2004; Nevaeh, born in April 2009; and Caiden, born in April 2013. Amber is the biological mother of each of the minor children. Michael is the biological father of Caiden.

### 2. PROCEDURAL BACKGROUND

In November 2015, the Department of Health and Human Services received an intake regarding Alexis, Nevaeh, and Caiden as a result of Amber's use of controlled substances. The children were living with Amber in the home of their maternal grandparents, Joe and Cheryl. A safety plan was put into place that included a provision that Amber could not parent the children alone or live in her parents' home while she tested positive for methamphetamine. The goal was to avoid removing the children from the parental home, and to avoid making them state wards. Amber voluntarily participated in drug testing, admitted to using methamphetamine and marijuana and tested positive for both. Amber did not violate the safety plan, but DHHS requested the children become state wards when Amber entered residential treatment.

On January 14, 2016, the State filed a petition alleging that Alexis, Nevaeh, and Caiden lacked proper parental care through the fault or habits of their mother, Amber. The petition was amended on January 25 to include the alleged fathers of each of the children. The second amended petition was filed on March 4. The petition alleged Amber tested positive for methamphetamine and marijuana, she failed to provide a safe and stable home, and Amber's actions placed the children at risk for harm. Following a hearing on March 4, the children were found to be juveniles as defined by Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2015), as they lacked parental care through the fault or habits of their mother.

On March 4, 2016, the children were placed in the temporary legal and physical custody of DHHS, with physical placement to be in Joe and Cheryl's home. Joe and Cheryl's home was eventually deemed to be inappropriate because it was dirty, cluttered, and had several repairs that needed to be completed. Efforts to clean the home were unsuccessful, so the children were placed in foster homes. Caiden was placed in the agency-based home of Nathan and Cristin, and Alexis and Nevaeh were placed with Donald and Hidi H. Donald is Nevaeh's biological father. The children remained in the same foster homes throughout the pendency of this case.

On March 17, 2016, Michael filed a motion for placement change, requesting that Caiden be placed in his home. Following a hearing on April 12, the order of the juvenile court stated that if Michael wanted to be considered for placement, he must cooperate with random drug and alcohol testing and complete a substance abuse evaluation. He was ordered to have reasonable rights of supervised visitation. Michael did not complete a substance abuse evaluation.

In the April 2016 order, the court set forth a plan that required Amber to: refrain from using controlled substances; participate in random drug testing; enter and complete short-term residential treatment; refrain from any illegal activities; maintain a legal means of support for herself and the

children; maintain a safe and stable living environment for herself and the children; cooperate with parent-child dyadic assessment with Caiden; and engage in supervised parenting time.

Amber's parenting time was temporarily suspended on July 11, 2016, until she was released from incarceration. On November 1, the court reinstated her right to therapeutic contact/supervised visitation as arranged by DHHS.

A motion for termination of Amber and Michael's parental rights was filed on January 26, 2017. The petition alleges that grounds for termination of Michael's parental rights existed under § 43-292(1), (2), (6), and (9) and that termination was in Caiden's best interests. The petition alleged that grounds for termination of Amber's parental rights existed under § 43-292(2), (4), and (6) and that termination was in Alexis and Caiden's best interests. Nevaeh was not part of the motion for termination of Amber's parental rights because she was placed with her biological father, who was working to establish custody.

On February 15, 2017, a supplemental petition was filed alleging that Caiden lacked proper parental care through the fault or habits of his father, Michael. The petition alleged that Michael was aware of the ongoing juvenile case involving Caiden since at least January 28, 2016, and that Caiden was placed outside of the family home beginning on March 4. The petition alleged that Michael failed to place himself in a position to assume the custody and care of Caiden, he failed to maintain contact with Caiden and his custodian, DHHS, and Michael's actions placed Caiden at risk for harm.

Michael filed a response to the supplemental petition on February 27, 2017, denying the allegations against him, and affirmatively alleging that he was denied the opportunity to maintain contact with Caiden and the opportunity to assume the care and custody of the child.

Hearings were held on April 24 and May 15, 2017. The hearings were a formal adjudication on the supplemental petition, and on the motion for termination of Amber's and Michael's parental rights.

### 3. Evidence Presented at Termination Hearing

#### (a) Evidence Regarding Amber

Nicole Lemke, a Child and Family Services supervisor with DHHS, testified that she was assigned as the case manager for Amber and the children in February 2016. The case was transferred from Lemke to Heather Sisel, a case manager, in December. At that time Lemke became a supervisor, and continued to be involved in this case, as the supervisor assigned.

Initially Lemke and Amber communicated in person and over the phone and Amber voluntarily submitted to drug testing. Amber's tests were positive for methamphetamine and some of the tests were also positive for marijuana.

Amber completed a substance abuse evaluation at CenterPoint and short-term residential treatment was recommended. Lemke placed Amber's name on the waiting list at Saint Monica's. Amber entered treatment prior to adjudication, but did not successfully complete the program. Lemke testified that Amber was at Saint Monica's for approximately 18 days before reporting that "she needed to leave because her boyfriend was back in town." Lemke testified that at that time visits were scheduled four times per week. The only time Amber was consistent with visitation was when visits occurred during the 18-day stint at Saint Monica's. Lemke testified that Amber had difficulty controlling the younger children's behavior during visits.

Amber entered residential treatment at Saint Monica's again in May 2016 and stayed approximately 3 days. Amber reported that there was too much drama and she did not like that she could not smoke. Lemke explained to Amber that she needed to complete treatment to help with reunification with her children.

Amber completed a new substance abuse evaluation in June 2016, and short-term residential treatment was recommended. Lemke was unable to get Amber onto a waiting list for treatment, as she was convicted for possession of a controlled substance, and was sentenced to a jail term. Amber was released from jail on or around August 27. Amber did not maintain sobriety after her release from jail, and admitted to taking a hydrocodone pill that was not prescribed to her on the day she was released.

Amber entered Saint Monica's in September 2016, but did not successfully complete the program. She entered residential treatment at Touchstone at the end of October. Amber reported that she needed to leave Touchstone to seek medical attention. Amber was informed that Touchstone would allow her to come back into treatment if she returned by 2 p.m. and she did not do so, so she was not allowed to continue in the program.

Amber entered treatment at Seekers of Serenity in early January 2017, but left after approximately 7 days. She was arrested on January 16 for possession of a controlled substance and was incarcerated.

After the motion for termination of her parental rights was filed, Amber entered and completed short-term residential treatment at Seekers of Serenity over a 30-day period in February and March 2017. It was recommended that Amber engage in aftercare of intensive outpatient treatment and community support, such as Narcotics Anonymous (NA) or Alcoholics Anonymous (AA).

Amber did not provide the caseworker with documentation that she attended NA or AA meetings. A letter of agreement was completed for intensive outpatient treatment through Lutheran Family Services, and an appointment was scheduled. Amber did not attend the appointment and did not begin the intensive outpatient program. Amber was scheduled to drug test approximately twelve times per month. After her discharge she had two negative drug tests, and was a "no show" for all other drug tests. Lemke testified that a "no show or a refusal is considered a positive drug test."

Amber expressed the desire to see the children after her discharge, but was informed that the children's therapists recommended no in-person contact. Amber was offered services to assist her in obtaining her own residence. She was assigned a peer support mentor and was offered family support services. Amber was ordered to complete a neuropsychological evaluation. In order to complete this evaluation, a person is required to be sober for thirty days. Lemke testified that the only time Amber was sober for 30 consecutive days was while she was in jail, and she had relapsed immediately upon her release.

Lemke testified that it would be difficult to determine whether Amber could safely parent the children because she had not maintained her sobriety for an extended period of time, she was unemployed, and during this case she was not able to provide a safe and stable home for the children. Lemke testified that it was in the children's best interests for Amber's parental rights to be terminated.

Sisel testified that Alexis and Caiden's needs for permanency were being met in their current placement. Alexis and Caiden's foster placements indicated that they were willing to provide permanency. Sisel testified that Amber has not taken the necessary steps to address her methamphetamine addiction, and her addiction was the primary reason for the adjudication in this case. Sisel testified that termination of Amber's parental rights is in Alexis and Caiden's best interests.

Sarah Dunham, an outpatient mental health therapist with Jenda Family Services completed a Child Parent Psychotherapy (CPP) assessment with Caiden when he was 3 years old. Dunham found Caiden to have developmental delays in the areas of fine motor skills, communication, problem solving, and personal social development, and she also diagnosed Caiden with regulation disorders of sensory processing. Lemke testified that in March and April of 2016, Caiden exhibited some behavioral issues including running from caregivers, not using utensils, spitting and hitting, and these behaviors decreased after approximately 1 month in the foster home.

Dunham performed a Crowell Assessment with Caiden and Amber, as well as Caiden and his foster mother, Cristin. During this assessment, Dunham observed the interaction between the child and each caregiver to assess the attachment and to assess any mental or behavioral health deficits which require treatment. Dunham stated that when a child develops a secure attachment, they gain the ability to regulate their emotions, have less anxiety, and there is a decreased chance of developing a severe and persistent mental illness in the future. Once a child is able to develop a secure bond with a caregiver, it is easier for the child to develop secure bonds with other adults in their life. Dunham found there was a secure attachment between Caiden and Cristin, and that Caiden's attachment with Amber was "unsecured and disorganized," which means that a caregiver is the source of comfort for a child, but also a source of distress.

CPP is considered to be an appropriate treatment for regulation and sensory processing disorders, and requires consistency by the caregiver to be effective. Dunham recommended CPP between Caiden and Cristin. Dunham began CPP with Caiden and Cristin in May 2016. The goals were to increase Caiden's social development, his ability to process sensory stimuli, and to work on emotional regulation skills. Cristin and Caiden did not successfully complete CPP, because Cristin transitioned from substitute teaching to full-time teaching and her work schedule did not allow for the remaining sessions. Their last session with Dunham was in October.

Dunham observed that Caiden had made progress; he became potty trained, expanded his vocabulary and language skills, had a longer attention span, was able to follow directions more effectively, and Cristin was able to help him regulate his emotions when he was distressed. Dunham attributed those improvements to a stable environment and caregiver. Caiden was enrolled full-time in the program at Behaven in the summer of 2016, and was enrolled in the half-day program in the fall, when he began attending preschool. As part of the program, Cristin and Caiden participated in therapy together.

Dunham started CPP with Amber, but Amber did not show up for a session, and then she became incarcerated. Lemke testified that Amber was sentenced to 180 days, and served approximately 87 days. Dunham did not recommend further CPP for Amber and Caiden because Amber was unstable, engaged in substance abuse, was in and out of jail at the time, and lacked insight into Caiden's developmental needs. Amber was not asked to participate in therapy at

Behaven with Caiden. After Amber's discharge from Seekers of Serenity, the therapist at Behaven recommended that there be no contact between Amber and Caiden.

Elizabeth Sizer, an outpatient mental health therapist at Jenda Family Services, completed a trauma assessment of Alexis in April 2016, when she was eleven years old. Alexis presented with some depressive symptoms, including withdrawal, isolation, lack of emotional expression, and hygiene issues. She was diagnosed with adjustment disorder with depressed mood. Due to her trauma history, her exposure to neglect, and her mother's substance abuse, it was recommended that Alexis participate in weekly individual therapy with a trauma-based therapist. Sizer recommended family therapy with Amber, when it was "clinically appropriate," meaning when Amber was sober.

Alexis saw Sizer for individual therapy on a weekly basis beginning in May 2016 and every other week beginning in October. Alexis' treatment goals were to manage depressive symptoms, process the past and any neglect she experienced, process her relationship with Amber and Amber's substance abuse, and to work on healthy communication with Amber and her foster caregivers. Alexis became more open and comfortable in therapy sessions and in her foster home. She began adjusting to her environment and "becoming more like a normal teenager," testing boundaries appropriately. Sizer said Alexis began to express her thoughts and feelings about Amber's substance abuse.

Amber and Alexis met with Sizer for three family sessions on September 21 and October 5 and 19, 2016. The family sessions went well, but October 19 was the final family session, as Amber began a residential treatment program the next day. When Amber did not complete the treatment program, it upset Alexis, emotionally. Alexis expressed her feelings regarding her mother in individual therapy. She told Sizer that she loved Amber and wanted a relationship with her, but indicated that she was disappointed, frustrated, and embarrassed by Amber's struggle with substance abuse. Alexis was discharged from individual therapy on January 18, 2017. At that time, she indicated to Sizer that she did not want contact with Amber until Amber had successfully completed treatment.

Sizer testified that during their conversations and sessions Amber did not "present with any insight into how the substance abuse [had] been negatively affecting her children." Sizer testified that it is important for a child to have a sense of permanency and consistency to feel secure and thrive in their environment. She testified that children who have that tend to have higher self-esteem, fewer mental health issues, and more success in school. She testified that Alexis would benefit from a safe, secure, open, loving, and structured relationship, and that Alexis' needs have been met in her foster home. After Amber was discharged from Seekers of Serenity, Sizer recommended that the level of contact between Amber and Alexis be letters and phone calls.

### (b) Evidence Regarding Michael

Lemke testified that she attempted to contact Michael beginning when the children were removed from Joe and Cheryl's home. Michael did not respond to her text messages or voicemails, but she was able to speak to him at court and provide him with her contact information. Lemke testified that Michael did not call her, but he wrote her one letter while he was in the Lancaster County jail in the summer of 2016. Michael had pled no contest to a charge of assault and pled guilty to a charge of failure to appear in court. He was sentenced to serve a term of 46 days in jail.

- 6 -

In his letter to Lemke, he indicated that he had "messed up" and asked Lemke not to give up on him and "let him have another chance to raise his son."

In November 2016, Michael was charged with one count of theft by unlawful taking, and another count of theft by unlawful taking, second offense. He was convicted in both cases and was sentenced to a term of 6 months in jail and a term of 182 days in jail, to be served consecutively. Also in November, Michael pled guilty to possession of a controlled substance, a Class IV felony, and he was sentenced to a term of not less than 18 months' imprisonment. In January 2017, Michael pled guilty to theft by unlawful taking, second offense in two separate cases. The two charges were based upon Michael's actions in November 2016. He was sentenced to a term of 180 days' imprisonment for each case. The sentences were to be served consecutively, and consecutively to any sentences he was already serving at that time.

Lemke testified that she did not set up a substance abuse evaluation for Michael because, at the time, she did not know Michael's whereabouts. There are a few providers who are willing to complete the substance abuse evaluation in the jail, but Michael did not indicate to Lemke that he wanted placement, so she did not contact the providers on his behalf.

Lemke testified that Michael has been "in and out of jail multiple times," he did not maintain consistent contact throughout this case, and was not able to provide stable housing or maintain stable employment. Michael did not provide any cards, letters, or pictures for Caiden, and the DHHS could not verify whether Michael was sober.

Dunham testified that she would have liked to do a CPP assessment with Michael, but she was not able to because he was incarcerated or his whereabouts were unknown at that time. She had no personal contact with Michael, but she had concerns regarding introducing Caiden to Michael too quickly. She said that due to Caiden's sensory processing diagnosis, she was concerned that Caiden would not be able to regulate his emotions and he would regress in his behavior and development. Dunham testified that Caiden needs a stable, structured home environment, where he knows what is going to happen next, and that his needs are being met in his foster home.

Sisel testified that since she became involved in this case in December 2016, Michael has been incarcerated and she sent him a letter each month. Michael responded with monthly letters stating that he did not want his parental rights to be terminated, and he wanted the opportunity to be a father to Caiden. He indicated that he completed a substance abuse evaluation with Associates in Counseling. Michael's mother told Sisel that she would send a copy of the evaluation to DHHS, but it was never received.

Sisel testified that since she became involved in this case Michael has not provided anything for Caiden; a card, a letter, a gift, clothing, candy, pictures, etc. Michael's mother indicated that she and her husband were older and not in a position to take placement of Caiden. Sisel testified that children need permanency, a routine, and stability and Caiden's needs are being met in his current placement. Sisel stated that, since she was assigned to this case, she has not determined that Michael could safely provide for and parent Caiden. She opined that Michael would need to show that he has safe and stable housing, he can provide Caiden with routine and structure, and he would need to drug test, all of which he is unable to do while he is incarcerated. Once released, Michael would need to be able to show that he can remain sober, and maintain a

safe and stable living environment. Whether Michael is capable of providing that is unclear. Lemke and Sisel both testified that it was in Caiden's best interests to terminate Michael's parental rights.

## 4. JUVENILE COURT ORDERS

On May 25, 2017, the juvenile court entered two orders. In the first order, the juvenile court found that the allegations in the supplemental petition regarding Michael were true by a preponderance of the evidence. The court adjudicated Caiden as a juvenile who lacks proper parental care through the fault or habits of his father, Michael, and found that the State proved by clear and convincing evidence that statutory grounds for termination existed under § 43-292(1), (2), (6), and (9). The court found that the State rebutted the presumption that Michael is a fit parent and that termination of Michael's parental rights is in Caiden's best interests.

In the second order, the juvenile court found that the State proved by clear and convincing evidence that statutory grounds for termination of Amber's parental rights existed under § 43-292(2), (4), and (6). The court found that the State rebutted the presumption that Amber is a fit parent and that termination of Amber's parental rights is in Alexis and Caiden's best interests.

Amber appeals and Michael cross-appeals from the juvenile court's orders.

## III. ASSIGNMENTS OF ERROR

Amber asserts the juvenile court erred in finding that the children came within the meaning of § 43-292(2), (4), and (6) and that termination of her parental rights was in the children's best interests. Thus, she asserts the court erred in terminating her parental rights.

On cross-appeal, Michael assigns that the juvenile court erred in finding that the children came within the meaning of § 43-292(1), (2), and (6) and that termination of his parental rights was in Caiden's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

## V. ANALYSIS

In the Nebraska statutes, the bases for termination of parental rights are codified in § 43-292, which provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Giavonna G.*, 23 Neb. App. 853, 876 N.W.2d 422 (2016).

### 1. TERMINATION OF AMBER'S PARENTAL RIGHTS

#### (a) Statutory Grounds for Termination

In its order terminating Amber's parental rights to Alexis and Caiden, the juvenile court found that the State proved by clear and convincing evidence that statutory grounds for termination existed under § 43-292(2), (4), and (6). On appeal, Amber challenges each of these findings.

Section 43-292(2) provides that parental rights may be terminated if the parent has substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection.

The children were adjudicated as a result of Amber's continuing positive drug tests for methamphetamine and marijuana and her failure to provide a safe and stable home for the children. The evidence shows that Amber continued to struggle with her addiction in the subsequent months, as she entered and exited short-term residential treatment on multiple occasions. Amber was informed throughout this case that she needed to complete treatment to help with reunification with her children. Nonetheless, she repeatedly left treatment for various reasons; for example, because there was "too much drama," she wanted to smoke cigarettes, or she wanted to see her boyfriend.

It was not until after the motion for termination was filed that she successfully completed treatment. We recognize that she made some progress toward her goals, but the Nebraska Supreme Court has held that last-minute attempts by parents to comply with the rehabilitation plan do not prevent termination of parental rights. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016).

Further, while Amber did successfully complete a short-term treatment program in February and March 2017, she did not provide documentation showing that she was participating in the recommended aftercare. She did not provide proof that she attended AA or NA group sessions, that she took steps to enroll or engage in intensive outpatient treatment, and she failed to engage in the court-ordered random drug testing. Each of the missed drug tests is considered to be a positive test. In short, she has not demonstrated a commitment to complying with the case plan or maintaining her sobriety following the successful completion of her short-term residential treatment program.

In addition, Amber has not demonstrated the ability to provide a legal means of support and a safe and stable living environment. She failed to cooperate with efforts to find suitable housing. A parent's failure to provide an environment to which her children can return can establish substantial, continual, and repeated neglect. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015). Further, past neglect, along with facts relating to current family circumstances which go to best interests, are all properly considered in a parental rights termination case under § 43-292(2). *In re Interest of Joseph S. et al., supra.*

Amber argues that she provided gifts, letters, and cards to the children, and she engaged in visits and therapy with the children when it was allowed by the court. She argues that the law does not require perfection of a parent, instead the court should look for continued improvement in parenting skills and a beneficial relationship between parent and child. While these things are true, visitation was suspended when Amber was incarcerated, and, after her release, visits were not recommended due to the fragile emotional and behavioral health of her children. Alexis and Caiden's therapists did not recommend in-person contact with Amber after her completion of treatment program. In addition, for significant portions of time during the pendency of this case Alexis expressed her desire not to see her mother.

Amber argues that because the State has not pursued termination of her parental rights to Nevaeh, her rights to Alexis and Caiden should not have been terminated. This argument fails because Lemke expressly stated that Nevaeh was not part of this motion to terminate because

Nevaeh was placed with her biological father, who provided a safe and stable home to Nevaeh, as well as Alexis, and who was working to establish custody of Nevaeh. The record is clear that the decision not to seek termination of Amber's parental rights to Nevaeh was not related to the actions or inactions of Amber.

Our de novo review of the record clearly and convincingly shows that grounds for termination of Amber's parental rights under § 43-292(2) were proved by sufficient evidence. If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. See *In re Interest of Giavonna G., supra.* Thus, we need not discuss the evidence presented which supported the juvenile court's findings pursuant to § 43-292(4) or (6). Once a statutory basis for termination has been proved, the next inquiry is whether termination is in the child's best interests.

(b) Best Interests

The juvenile court found the State established by clear and convincing evidence that termination of Amber's parental rights was in the children's best interests. Amber asserts the juvenile court erred in reaching this conclusion.

A child's best interests are presumed to be served by having a relationship with his or her parent. This presumption is overcome only when the State has proved that the parent is unfit. *In re Interest of Alec S., supra.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests analysis and the parental unfitness analysis are separate inquiries, but each examines the same underlying facts as the other. *Id.*

Amber argues that Alexis expressed her desire to maintain a relationship with her mother, that she wasn't given the opportunity to resume family therapy with Alexis after her discharge from treatment, and that allowing the children to be adopted will cause irretrievable damage to the sibling relationship between Alexis and Caiden.

The evidence shows that Alexis had reservations about resuming contact with her mother, and that Alexis and Caiden's therapists did not recommend in-person contact with Amber after she completed her residential treatment program. Alexis told Sizer in January 2017 that she was frustrated and disappointed that Amber continued to struggle with substance abuse, and that Amber was not completing the treatment necessary to recover and reunify. After the motion for termination of her parental rights Amber did complete treatment, but she did not demonstrate the ability to follow through with the case plan. She failed to obtain and maintain safe and stable housing, she failed to drug test, she is unemployed, and she failed to demonstrate that she was engaging in the recommended aftercare or that she had the ability to maintain a sobriety outside of a controlled treatment setting.

Essentially, the evidence presented by the State revealed that Amber is only marginally closer to achieving reunification with her children than she was at the inception of the proceedings. The same issues which led to the children's removal from Amber's care are still plaguing the

family. Nebraska courts have consistently held that "[c]hildren cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Jahon S.,* 291 Neb. 97, 106, 864 N.W.2d 228, 235 (2015). The record shows that substantial progress would need to occur before the children could be reunified with their mother.

Alexis and Caiden need and deserve permanency. Evidence was presented that after they were placed in foster care they made significant emotional and behavioral progress. Alexis was discharged from therapy after she progressed and met her treatment goals. Caiden demonstrated marked improvement and Dunham testified that this was primarily because he was in a stable environment with a stable caregiver. Lemke and Sisel testified that termination of Amber's parental rights is in Alexis and Caiden's best interests.

The State presented sufficient evidence to rebut the presumption that Amber is a fit parent. Upon our de novo review, we find the State established by clear and convincing evidence that termination of her parental rights is in the children's best interests.

## 2. TERMINATION OF MICHAEL'S PARENTAL RIGHTS

### (a) Statutory Grounds for Termination

In its order terminating Michael's parental rights to Caiden, the juvenile court found that the State proved by clear and convincing evidence that: (1) Michael abandoned Caiden for the 6 months or more immediately prior to the filing of the petition (§ 43-292(1)); (2) Michael substantially and continuously or repeatedly neglected or refused to give Caiden proper parental care and protection (§ 43-292(2)); (3) reasonable efforts to preserve and reunify the family have failed to correct the conditions leading to the determination (§ 43-292(6)); and (4) Michael subjected Caiden to aggravated circumstances including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse. (§ 43-292(9)).

It is well established that parental rights may not be terminated solely for a parent's incarceration, however a parent's incarceration may be considered along with other factors in determining whether parental rights can be terminated based on neglect. See *In re Interest Josiah T.,* 17 Neb. App. 919, 773 N.W.2d 161 (2009), See, also, *In re Interest of Kalie W.*, 258 Neb. 46, 601 N.W.2d 753 (1999). Additionally, in termination proceedings, the inability to perform parental obligations because of imprisonment is relevant to the issue of fitness and may be considered. See *In re Interest of Josiah T., supra*. See, also, *In re Interest of L.V.*, 240 Neb. 404, 482 N.W.2d 250 (1992).

The evidence shows that Michael had one pending criminal charge at the time the initial petition was filed. Michael was charged for crimes occurring on May 1, 2, and 7, and November 1, 2016, all of which were committed after the children were removed from Amber's care. He was ultimately convicted and sentenced on all counts prior to the motion for termination of his parental rights. He received consecutive sentences of 180 days, 180 days, 182 days, 6 months, and 18 months, and he was incarcerated at the time of the hearing on the State's motion for termination of his parental rights.

Michael argues that he should be allowed the opportunity to parent his child, and that his incarceration should not be classified as neglect, as he was not offered certain services. The record shows that Michael had knowledge that his child was placed in foster care at the time of the adjudication in March 2016. He continued to engage in unlawful behavior which led to the criminal

charges and resulting convictions and sentences. Thus, he has failed to put himself in a position to parent his child throughout this case. We find the State proved by clear and convincing evidence that grounds for termination existed under § 43-292(2).

(b) Best Interests

In his cross-appeal, Michael alleges the juvenile court erred in finding there was clear and convincing evidence that termination of his parental rights was in Caiden's best interests.

This case was initiated in January 2016. The caseworker was not immediately successful in contacting Michael, but did speak to him at one of the early court proceedings. Michael expressed a desire to obtain placement of Caiden, and the court set forth the procedure for Michael to achieve that goal, which included compliance with random drug and alcohol testing, and completion of a substance abuse evaluation. There is no evidence that the evaluation was completed and shortly thereafter Michael became incarcerated. In his letter to the caseworker he acknowledged that he had "messed up" and he still wished to cultivate a relationship with Caiden. Michael was convicted and sentenced in several other criminal cases after that point. Throughout 2016, Michael continued to engage in the type of criminal behavior which hampered his ability to parent his son.

Michael sent several letters to the assigned caseworker indicating that he did not wish for his parental rights to be terminated, but he has not sent any cards, gifts, or letters to Caiden since the initiation of this matter. There was no evidence presented showing a relationship between Caiden and Michael; they have not shared any visits, nor has Michael requested visits.

Evidence was presented that Caiden has difficulty regulating his emotions, and his therapist expressed concern that he would regress in his behavior and development if he were introduced to Michael too quickly. Dunham testified that Caiden needs a stable, structured home environment, where he knows what is going to happen next, and that his needs are being met in his foster home.

Caseworkers testified that they have been unable to determine whether Michael could safely provide for and parent Caiden due to his pattern of criminal behavior and incarceration. He has not demonstrated the ability to provide a safe and stable living environment, and it is unclear whether he would be able to remain sober after his release from incarceration. Lemke and Sisel both testified that it was in Caiden's best interests to terminate Michael's parental rights.

Michael argues that he has not had the opportunity to parent his child and that DHHS has not provided services and efforts to assist him in cultivating a relationship with Caiden. Although incarceration cannot be the sole basis for terminating parental rights, it is a factor to be considered. *In re Interest of Jahon S., supra.* See, also, *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002). The Nebraska Supreme Court has noted that although incarceration itself may be involuntary as far as a parent is concerned, the criminal conduct causing the incarceration is voluntary. *Id.* Thus, in a case involving termination of parental rights, it is proper to consider the parent's inability to perform his or her parental obligations because of incarceration. *Id.* Incarceration of a parent, standing alone, does not furnish a ground for automatic termination of parental rights. However, it does not insulate a person from the termination of his parental rights if the record contains clear and convincing evidence that would support the termination of the rights of any other parent. See *id.*

The State established by clear and convincing evidence that Michael has engaged in behavior that resulted in incarceration, thereby preventing him from taking care of and providing for his child. Michael will not be available to meet Caiden's day-to-day needs while he remains incarcerated, serving multiple consecutive sentences to imprisonment. Even after his release, it is unclear when, or whether, Michael will be in a position to adequately provide and care for Caiden. Caiden has been in foster care since March 2016 and has demonstrated a need for stability and permanency. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Jahon S., supra.*

As previously discussed, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. The State presented sufficient evidence to rebut the presumption that Michael is a fit parent. Upon our de novo review, we find the State showed by clear and convincing evidence that termination of Michael's parental rights is in Caiden's best interests.

## VI. CONCLUSION

We conclude the State proved by clear and convincing evidence that grounds for termination of Amber's and Michael's parental rights existed under § 43-292(2) and that termination is in the children's best interests. Accordingly we affirm the orders of the juvenile court which terminated Amber's parental rights to Alexis and Caiden, and Michael's parental rights to Caiden.

AFFIRMED.